## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

LAJARVIS LOVE AND JOSHUA LOVE,

*Plaintiff*s,

v.

PAUL WEST; SAINT FRANCIS OF ASSISI SCHOOL; CATHOLIC DIOCESE OF JACKSON; FRANCISCAN BROTHERS OF BROOKLYN; FRIARS OF ASSUMPTION BVM PROVINCE, INC.; AND JAMES GANNON,

*Defendants.*

Index No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs, LaJarvis Love and Joshua Love, by and through undersigned counsel, bring this action under federal and state law against Defendants, as defined below, for personal injury. Plaintiffs further seek a declaratory judgment under the Declaratory Judgment Act and Rule 57 of the Federal Rules of Civil Procedure. *See* 28 U.SC. § 2201(a). Plaintiffs, upon personal knowledge and upon information and belief, state as follows:

### I.   **INTRODUCTION**

1.      This civil action comes to this Court as a result of a systemic pattern of child molestation and abuse, and sexual assault and exploitation resulting in settlement agreements obtained through undue influence, mistake and other affirmative defenses to their formation and enforcement. The confidentiality provisions contained in the disputed agreements were intended to silence Plaintiffs and in direct contradiction to the Catholic Church's Charter for the Protection

1

of Children and Young People.[1]

II.    **PARTIES**

2.      Plaintiff, LaJarvis Love ("Plaintiff" or "LaJarvis"), is an adult citizen of the United States and is domiciled in the town of Senatobia in Tate County, Mississippi.

3.      Plaintiff, Joshua Love ("Plaintiff" or "Joshua"), is an adult citizen of the United States and is domiciled in the town of Greenwood in LeFlore County, Mississippi.

4.      Defendant, Paul West ("West"), is an adult citizen of the United States and, upon information and belief, is domiciled in the town of Greenville in the State of Wisconsin, Outagamie County.

5.      Defendant, Saint Francis of Assisi School ("St. Francis"), is organized and/or existing under the laws of the State of Mississippi and is located at 2607 Highway 82 East, Greenwood, Mississippi, LeFlore County.

6.      Defendant, Catholic Diocese of Jackson ("Diocese of Jackson"), is organized and/or existing under the laws of the State of Mississippi and located at 237 East Amite, Jackson, Mississippi, Hinds County.

7.      Defendant, Franciscan Brothers of Brooklyn ("Franciscan Brothers"), formally known as the Congregation of the Religious Brothers of the Third Order Regular of St. Francis, is organized and/or existing under the laws of the State of New York and located at 135 Remsen Street, Brooklyn, New York, Kings County.

8.      Defendant, James Gannon ("Gannon"), is an adult citizen of the United States and, upon information and belief, is domiciled in the State of Wisconsin, Milwaukee County.

9.      Defendant, Friars of Assumption BVM Province, Inc. ("Franciscan Friars BVM"),

---

[1] *See* http://www.usccb.org/issues-and-action/child-and-youth-protection/upload/Charter-for-the-Protection-of-Children-and-Young-People-2018-final.pdf. (Last viewed November 18, 2019).

known as the Franciscan Friars, is organized and/or existing under the laws of the State of Wisconsin and is located at 9230 West Highland Park Avenue, Franklin, Wisconsin, Milwaukee County.  The Franciscan Friars have staffed St. Francis for over 60 years.

10.     Defendants, Brother Paul West, Saint Francis of Assisi School, Catholic Diocese of Jackson, Franciscan Brothers of Brooklyn, James Gannon, and Friars of Assumption BVM Province, Inc. are collectively referred to as the "Defendants."

11.     Between June 1993 and November 1998, West, served as a Brother at St. Francis under the direction and supervision of the Diocese of Jackson.

12.     At all relevant times, Diocese of Jackson, controlled, directed, managed, oversaw and operated parishes, churches or schools of the Catholic Church, including St. Francis.

13.     At all relevant times, St. Francis, employed, managed, supervised, directed and/or controlled each and every Brother and/or Cleric assigned to work in parishes, churches or schools of the Catholic Church, including West.

14.     At all relevant times, Diocese of Jackson, employed, managed, supervised, directed and/or controlled each and every Brother and/or Cleric assigned to work in parishes, churches or schools of the Catholic Church, including West during his time while serving as a Brother at St. Francis.

15.     At all relevant times, each and every Brother and/or Cleric assigned to St. Francis by Diocese of Jackson, including West and Brother Don Lucas, were agents, representatives, managers, directors and/or employees of St. Francis.

16.     At all relevant times, each and every Brother and/or Cleric assigned to the Diocese of Jackson, including West and Brother Don Lucas, were also agents, representatives, managers, directors and/or employees of the Diocese of Jackson operating under the purview and subject to

3

the supervision, rules, policies and procedures of the Diocese of Jackson.

17.     At all relevant times, each and every Brother and/or Cleric assigned to the Diocese of Jackson by Franciscan Friars BVM, including West and Brother Don Lucas, were agents, representatives, managers, directors and/or employees of Franciscan Friars BVM.

18.     At all relevant times, each and every Brother and/or Cleric assigned to the Franciscan Brothers by Franciscan Friars BVM were agents, representatives, managers, directors and/or employees of the Franciscan Brothers.

19.     At all relevant times, each and every Brother and/or Cleric assigned to the Franciscan Brothers by Franciscan Friars BVM were agents, representatives, managers, directors and/or employees of the Franciscan Friars BVM.

20.     At all relevant times, the Franciscan Brothers operated Camp Alvernia, a summer camp in Centerpoint, New York and are subject to the authority of the Catholic Church, Holy See.

21.     Gannon was the leader, otherwise known as the Provincial Minister, of the Franciscan Friars BVM.

22.     At all relevant times, Franciscan Friars BVM, employed, managed, supervised, directed and/or controlled each and every Brother and/or Cleric assigned to work in parishes, churches or schools of the Catholic Church, including Gannon.

23.     At all relevant times, Gannon was an agent, representative, manager, director and/or employee of St. Francis, Diocese of Jackson, and the Franciscan Friars BVM.

24.     The Franciscan Friars BVM have staffed the St. Francis for over 60 years, including West who served as principal and fourth grade teacher, from 1993 to 1998.

### III.   <u>JURISDICTION AND VENUE</u>

25.     This Court has subject matter jurisdiction over this action in accordance with 28 U.S.C. § 1331 based upon federal claims asserted pursuant to 18 U.S.C. § 2255.

26.     Pursuant to 18 U.S.C. § 2255, any person who, while a minor, was a victim of certain federal statutory violations as alleged herein may sue in any appropriate United States District Court for a violation of federal claims under 18 U.S.C. § 2421. *See* 18 U.S.C. § 2255.

27.     Pursuant to 18 U.S.C. § 2255, any person who, while a minor, was a victim of certain federal statutory violations as alleged herein may sue in any appropriate United States District Court for a violation of federal claims under 18 U.S.C. § 2241(c). *See* 18 U.S.C. § 2255.

28.     This is a civil action alleging, *inter alia*, violations of 18 U.S.C. § 2421 and 18 U.S.C. § 2241(c).

29.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as the state law claims are so related to Plaintiffs' federal law claims that the claims form part of the same case or controversy.

30.     Venue is proper within this District Court as this District Court is a judicial district where Defendants are subject to personal jurisdiction in accordance with 28 U.S.C. § 1391(b)(2), as well as N.Y. C.P.L.R. § 302, the New York Long-Arm statute.

31.     Pursuant to N.Y. C.P.L.R. § 302, this Court can exercise personal jurisdiction over the Defendants as a result of Defendants committing tortious acts within New York. *See* N.Y. C.P.L.R. § 302.

32.     Pursuant to N.Y. C.P.L.R. § 302, this Court can exercise personal jurisdiction over the Defendants as a result of Defendants committing tortious acts outside of New York causing injury to Plaintiffs within New York. *See* N.Y. C.P.L.R. § 302.

33.     Defendants have consensually submitted to the jurisdiction of New York and have purposefully availed themselves of the privilege of conducting acts in New York and, thus, invoking the benefits and protections of the laws in New York; New York has an equally strong interest in protecting and assuring the safety of persons within its State, especially minor children.

34.     In or about the summer of 1995, West drove Plaintiffs across states lines from Mississippi to New York wherein tortious acts alleged herein were committed in New York.

35.     West's excursions from Mississippi to the summer camp in New York were, on information and belief, continuous and systematic during the time period he was a Brother at St. Francis.

36.     Defendants' tortious acts of child sexual abuse and trafficking were purposefully directed at the State of New York.

37.     Defendants' tortious acts of child sexual abuse and trafficking, including those in New York, are the subject of this civil action.

38.     Plaintiffs' claims alleged herein arose, in part, out of Defendants' persistent course of conduct in the State of New York.

39.     West committed intentional acts of sexual, physical, and emotional abuse against the Plaintiffs in the State of New York, including this District.

40.     Amongst many places, West abused Plaintiffs at a hotel in New York City during an overnight stay after West travelled with Joshua from Mississippi to New York to pick-up LaJarvis from a stay at Camp Alvernia.

41.     The conduct and contacts of West in the State of New York is imputed to the other named Defendants herein liable for negligently and recklessly supervising and managing West who allowed West to commit these horrific acts of abuse in this District, providing him with the

means and opportunity to commit such acts, and intentionally thwarting legal action by the Plaintiffs through Defendants' persuasion and dominant position of authority over Plaintiffs

42.     The conduct and contacts of Defendants, Franciscan Brothers and West, are imputed to all Defendants as agents of the Defendants for purposes of minimum contacts necessary for this Court to exercise personal jurisdiction over Defendants under the New York Long-Arm statute.

43.     At all relevant times, Defendants reasonably expected, or should have reasonably expected, that their tortious acts would have consequences in the State of New York.

44.     As a result of these tortious acts of child sexual abuse and trafficking in the State of New York, it is reasonable for all Defendants to anticipate being subject to litigation in New York and for this Court to exercise personal jurisdiction over Defendants as comporting with fair play and substantial justice.

## IV.     BACKGROUND AND FACTS

45.     Plaintiffs, LaJarvis Love and Joshua Love, are cousins who grew up in a section of Greenwood, Mississippi called Baptist Town, a small town in the Mississippi Delta.

46.     Plaintiffs grew up in very hard times and shared a small, three bedroom home with numerous members of their extended family in Greenwood, Mississippi.

47.     Plaintiffs were raised by their grandmother, Lou Alice Bolden ("Miss Lou"), who was the matriarch of Plaintiffs' family and who wanted a positive life for Plaintiffs as Plaintiff, Joshua's mother was addicted to drugs and his father had drifted away from home; Miss Lou cared for Plaintiffs, and paid for tuition and school uniforms for Plaintiffs.

48.     All of Miss Lou's five grandchildren were baptized in the Catholic Church and attended St. Francis church in Greenwood, Mississippi.

49.     The family's hardships presented the opportunity for exploitation and abuse.

50.     At all relevant times, the Diocese of Jackson operated 23 schools and 101 parishes and missions in the Mississippi area, including St. Francis.

51.     At all relevant times, St. Francis is, and was, a Roman Catholic parochial school within and under the authority and control of the Diocese of Jackson.

52.     The Diocese of Jackson's website identifies West and Brother Don Lucas (who also abused Plaintiffs) as being credibly accused of child sex abuse.[2]

53.     The Diocese of Jackson's website identifies West as being a member of the ministry of the Diocese of Jackson.[3]

54.     The Order of Friars Minor is one of the three Franciscan First Orders within the Catholic Church, acting under the authority, auspices and at the direction of the Catholic Church.

55.     The Franciscan Orders were established in the early 13th century by St. Francis to evangelize and work among the poor; Franciscan Friars BVM, based in Wisconsin, have been traveling to Mississippi in their trademark brown robes and sandals to fulfill that mission among the Delta's African-American citizens since the early 1950's.

56.     Like other religious order priests and brothers, the Franciscan Friars BVM report to their order's leaders in the U.S. and at the Vatican.  They are subject to bishops' authority and direction in parish work.

57.     Just 3% of American Catholics are of African-American descent but the percentage in Mississippi is higher, in part, because of missionary work by the Franciscan Friars BVM.  The

---

[2] *See* http://2o1bb93uvms11ppwm32hemxj-wpengine.netdna-ssl.com/wp-content/uploads/2019/08/Statement_PaulWest_docs_FINAL.pdf (Last viewed November 18, 2019).
[3] *Id.*

church lists 26 parishes in the Diocese of Jackson, out of 101, where African-Americans have a significant presence.

### V.   FACT-SPECIFIC ALLEGATIONS

58.     Through his position at, within, or for the other Defendants, West was put in direct contact with Plaintiffs, minor parishioners of the Diocese of Jackson and elementary school students at St. Francis.

59.     West, and, ultimately, Brother Donald Lucas, groomed Plaintiffs for sexual exploitation by offering to pay them money to work on the weekends at St. Francis doing yard work or cleaning up the church and school, which seemed like an act of generosity.

60.     Plaintiffs, as boys, would alternate weekends doing work at St. Francis and never worked together at the same time providing West the opportunity to commit acts of exploitation and abuse.

61.     As part of his effort of coercion over Plaintiffs, West would end the day with a meal at McDonald's or Pizza Hut for Plaintiffs, even on occasions driving Plaintiffs home with a stack of food for Plaintiffs' entire family.

62.     West, as Joshua's fourth-grade teacher, and, later, the school principal, encouraged Joshua by telling him he was a good student with a bright future; however, this special treatment soon led to repeated sexual assaults.

63.     Joshua had difficulties in school and, in fact, had failed reading in the 3rd grade.

64.     Joshua's reading comprehension presented a further opportunity for exploitation and abuse.

65.     While Joshua was in the fourth grade, West would take him to the empty school cafeteria where he would order him to drop his pants and bend over a railing while he "whupped"

him offering the choice of being beaten or molested.

66.     On some occasions, West demanded that Joshua allow him to fondle Joshua's bare penis or else be "whupped" by West.

67.     LaJarvis experienced the same abuse; while in school, West took LaJarvis into the men's bathroom at the school, took his penis out of his pants and underwear and ordered the young boy to hold West's penis while he urinated.

68.     Additionally, West also showed LaJarvis child pornography on a computer in his office at St. Francis.

69.     In 1995, when Joshua was in fifth grade and La Jarvis was in sixth, Brother Don Lucas ("Lucas") arrived at St. Francis and began working as a cook.

70.     As part of his effort to begin his coercion and persuasion over Plaintiffs, Brother Don Lucas asked Joshua and LaJarvis what West was doing to them in a perceived act of caring.

71.     Brother Don Lucas quickly took an interest in Joshua who he too began sexually molesting.

72.     That summer, West continued his campaign of abuse at Camp Alvernia in New York.

73.     During one of these summer excursions to New York, West was teaching Joshua how to float on his back in a motel swimming pool on the trip to New York and pushed Joshua's head under water.  When Joshua came up gasping, West threatened to drown Joshua if he ever told anyone he was being sexually assaulted.

74.     West drove LaJarvis from Mississippi to New York to take him to Camp Alvernia. During this excursion, West drugged LaJarvis and sexually molested him on the way and during the trip back, including inside the car within New York State limits.

75.     West drove back to Mississippi leaving LaJarvis at Camp Alvernia for a period of time.  West drove Joshua to pick up LaJarvis from Camp Alvernia and after picking up LaJarvis, the three of them stayed together in a hotel in lower Manhattan.

76.     While at the Manhattan hotel, similar to other stops along the way (as well as in the car), West separately abused Plaintiffs, raping and sexually assaulting them, making them perform sex acts on him, and encouraging them to perform sex acts with each other.

77.     Plaintiffs were repeatedly sexually abused by West at St. Francis in Greenwood, Mississippi, in New York, in Wisconsin, and at other locations while traveling with West.

78.     West used these encounters, gained through his position of authority at St. Francis which granted him access to Defendants' young parishioners and students, including Plaintiffs, while in fourth, fifth and sixth grades, to sexually assault, sexually abuse, and/or have sexual contact with minors, including Plaintiffs, in violation of federal and state laws, including the laws of the State of New York.

79.     At all times material hereto, West was under the employment, management, supervision, direction and/or control of Defendants, St. Francis, Diocese of Jackson, Franciscan Brothers, and Franciscan Friars BVM, directly or indirectly.

80.     Defendants, St. Francis, Diocese of Jackson, Franciscan Brothers, Gannon, and Franciscan Friars BVM, knew, and/or reasonably should have known, and/or knowingly condoned, and/or covered up, the inappropriate and unlawful sexual activities of West, who sexually abused Plaintiffs.

81.     Defendants, St. Francis, Diocese of Jackson, Franciscan Brothers, Gannon, and Franciscan Friars BVM, had the responsibility to manage, supervise, control and/or direct Brothers and Clerics, including West and Brother Don Lucas, who served at St. Francis, and specifically

11

had a duty not to aid, encourage and/or assist Brothers and Clerics, including West and Brother Don Lucas, to commit acts of sexual assaults and abuse of children by allowing, assigning, maintaining, and/or appointing them to positions within St. Francis having access to minors.

82.     Defendants, St. Francis, Diocese of Jackson, Franciscan Brothers, Gannon, and Franciscan Friars BVM had a duty to the Plaintiffs to ensure that Defendants did not offer opportunities for Brothers and Clerics, including West and Brother Don Lucas, to commit acts of sexual assaults and abuse of vulnerable minor children.

83.     Defendants, St. Francis, Diocese of Jackson, Franciscan Brothers, Gannon, and Franciscan Friars BVM knew, and/or should have known, that West used his position at St. Francis to assault and abuse minor children, including Plaintiffs, and to form an acquaintance that could be, and was, used to provide opportunities to exploit minor children for sexual abuse.

84.     In or about March of 2018, LaJarvis reported the abuse he suffered as a child to the Diocese of Jackson; thereafter, one of the Brothers from St. Francis contacted Gannon, provincial minister for the Franciscan Friars BVM, regarding the reported abuse.

85.     Gannon contacted LaJarvis and provided counseling to LaJarvis by placing him in contact with the victim's assistance coordinator, Valerie McClellan ("McClellan").

86.     McClellan, ultimately, began seeing LaJarvis as his therapist in her capacity as a licensed Mississippi therapist and counselor, and diagnosed LaJarvis as suffering from post-traumatic stress disorder due to the abuse he suffered at the hands of West.

87.     After contacting LaJarvis, in addition to counselling with McClellan, Gannon promised to help him with travel costs such as gas money, home renovation and repair expenses, tuition for vocational school in auto mechanics, financial support for LaJarvis' lawn care business, and setting up financial accounts for LaJarvis' future.

88.     Separately, Miss Lou saw a bulletin report about the abuse perpetuated by West and informed Joshua; upon realizing that another individual had successfully come forward, Joshua reported the abuse he suffered as a child to McClellan whose number was provided in the bulletin report.

89.     McClellan began seeing Joshua as his therapist in her capacity as a licensed Mississippi therapist and counselor, and diagnosed Joshua as suffering from post-traumatic stress disorder due to the abuse he suffered at the hands of West and Brother Don Lucas.

90.     McClellan put Joshua in contact with Gannon who told Joshua that he would provide for Joshua and promised to set aside funds for Joshua's future.

91.     McClellan and Gannon met with Joshua, and McClellan explicitly promised Joshua that she would help him get his life back together.

92.     McClellan and Gannon made it clear to LaJarvis and Joshua that they were in constant contact with one another.

93.     After gaining Plaintiffs' trust and fully understanding their vulnerabilities and defects, McClellan and Gannon began separately brokering a confidential compromise and settlement with Plaintiffs on behalf of Defendants, West, St. Francis, Diocese of Jackson and Franciscan Friars BVM, to settle claims of sexual assault and abuse.

94.     During the time McClellan and Gannon brokered a confidential compromise and settlement with Plaintiffs, McClellan acted in her official capacity as a Victims Assistance Coordinator with the Diocese of Jackson while also providing counseling as a licensed therapist to Plaintiffs and knowing the full extent of their mental susceptibility, suggestibility, and defect as a result of the abuse they suffered as children.

95.     During the time McClellan and Gannon brokered a confidential compromise and

settlement with Plaintiffs, Gannon acted in his official capacity as the provincial minister for the Franciscan Friars BVM while knowing the full extent of their mental susceptibility, suggestibility, and defect as a result of the abuse they suffered as children.

96.     McClellan and Gannon first met with Joshua and Miss Lou, and encouraged him to initially settle his claims for $10,000, then for $15,000, and discouraged Joshua from hiring a lawyer.

97.     During this initial meeting between McClellan, Gannon, Joshua and Miss Lou, it was understood among the group that Joshua could not read and, therefore, was not able to understand the terms of the settlement other that the settlement amount.

98.     When Joshua questioned the meager amount, McClellan told him that hiring a lawyer would result in the lawyer taking "all the money" and, therefore, Joshua would end up with much less.

99.     Joshua left the meeting without settling any claims and informed McClellan that $10,000 was not sufficient.

100.     After speaking with Gannon, McClellan informed Joshua that the agreement would be re-written for $15,000.

101.     Joshua, ultimately, entered into a settlement agreement for $15,000 without understanding the nature and scope of what he had agreed to.

102.     Upon learning that Joshua was receiving a settlement, LaJarvis met with Gannon along with his wife and three children.

103.     Gannon encouraged LaJarvis to settle his claims for $15,000, and discouraged LaJarvis from hiring a lawyer.

104.     Additionally, Gannon promised to continue to assist LaJarvis in the other manners

he was previously being assisted in including treatment, counselling and expenses.

105.    LaJarvis, ultimately, entered into a settlement agreement for $15,000 without understanding the nature and scope of what he had agreed to.

106.    McClellan and Gannon deceptively told Joshua and LaJarvis that a prospective settlement agreement was their only potential option for legal recourse against West due to the passage of time.

107.    Neither of the Plaintiffs fully understood the scope and terms of the agreement; additionally, Joshua did not understand the agreement due to his limited ability to read.

108.    McClellan and Gannon also made representations to Joshua and LaJarvis as to their ability to report criminal acts and bring civil claims against West and the other Defendants, indicating that too much time had passed pursue any claim.

109.    McClellan and Gannon, as agents of the other Defendants and in positions of power and control over the vulnerable Plaintiffs, persuaded Plaintiffs to sign the confidential settlement agreements without encouraging them to seek independent legal counsel and giving them an opportunity to do so.

110.    McClellan and Gannon both knew that Joshua and LaJarvis were in severe financial distress when they presented them with the settlement agreement and knew their bargaining power was far superior to the Plaintiffs.

111.    McClellan and Gannon both knew, or should have known, that Joshua and LaJarvis did not fully understood the scope and terms of the agreement; additionally, McClellan and Gannon both knew or should have known that Joshua did not understand the agreement due to his limited ability to read.

112.    Gannon promised that he had Plaintiffs' best interests in mind and would continue

to help them financially in excess of the settlement amount after each of them entered into the settlement agreement.

113.    Under the persistent influence of Gannon and with little means to hire independent counsel, Joshua signed a purported settlement agreement in November of 2018.

114.    In the settlement agreement, the parties are listed as being Joshua Love, Franciscan Friars, and the Friars of Assumption BVM Province, Inc.

115.    The agreement states that Joshua is to be paid $15,000 in exchange for his release of claims against "Br. West, Br. Lucas, and the Province."

116.    LaJarvis signed a similar document in January 2019 under the same persistent influence of Gannon and with little means to hire independent counsel; in the settlement agreement, the documents purport to include a number of unnamed individuals and related entities as being released parties.

117.    McClellan and Gannon met and negotiated with Joshua separate from LaJarvis and vice versa.

118.    Once Joshua signed the agreement, McClellan ceased all contact with Joshua despite their therapeutic relationship and Joshua's reliance on McClellan for counseling and support.

119.    Plaintiffs dispute the formation and enforcement of any purported settlement agreements and maintain that the settlement agreements were entered into through undue influence, mistake and were unconscionable.

120.    Plaintiffs have suffered severe personal physical and psychological injuries and damages as a result of Defendants' actions, as well as other damages related thereto, as a result of their repeated childhood sexual abuse.

121.     As a direct result of Defendants' conduct described herein, Plaintiffs have suffered, and will continue to suffer, great pain of mind and body, severe and permanent emotional distress, and physical manifestations of emotional distress.

122.     Plaintiffs were prevented from obtaining the full enjoyment of life and have incurred, and will continue to incur, expenses for medical and psychological treatment, therapy, and counseling, and have incurred and will continue to incur loss of income and/or loss of earning capacity.

### VI.    <u>EQUITABLE TOLLING</u>

123.     Plaintiffs repeat and re-allege each and every allegation set forth in the preceding paragraphs, as if fully set forth herein.

124.     Plaintiffs were unable to bring a claim prior to 2018 because of the malfeasance of the Defendants.

125.     West applied an orchestration of fear and power to abuse Plaintiffs and, in doing so, made them vulnerable to additional abuse.

126.     West exerted his power and position of authority over Plaintiffs by instilling in them an enduring fear of physical harm and general helplessness.

127.     West expelled Joshua from school, repeatedly beat him in the school cafeteria until the young boy relented, and explicitly threatened to kill Joshua if he ever told anyone about his assaults.

128.     In addition to brutal sexual assaults, West made sure his power over LaJarvis was known and understood through repeated displays of physical cruelty and humiliation.

129.     Through a constant fear of physical violence and a gross exploitation of a minor child's natural desire for attention, West indoctrinated Joshua and LaJarvis with a silent

submissiveness over a period of years.

130.    Prior to 2018, the only individual Joshua told about the sexual assaults he suffered at the hands of West was Brother Don Lucas – who was also sexually abusing Joshua at the time.

131.    Brother Don Lucas told Joshua that West should be feared.

132.    Brother Don Lucas died in 1999, and Joshua and LaJarvis believed that it was at West's hand.

133.    Joshua and LaJarvis lived in constant fear of West until 2018 and believed that they could not speak of the assaults by him that they endured without suffering further physical harm.

134.    In 2018, LaJarvis was first able to report the abuse he suffered at the hands of West after watching television coverage of a powerful man being prosecuted for sexual assault.  Only then, did LaJarvis see through the helplessness that had been cultivated in him by West.

135.    Immediately, LaJarvis reported the abuses he suffered to the entity he believed had power and control over the situation, St. Francis.

136.    Instead of taking appropriate action, St. Francis and Gannon manipulated LaJarvis' vulnerability to prevent him from taking legal action through their position of authority and control over LaJarvis.

137.    Gannon, acted in his official capacity as the provincial minister for the Franciscan Friars BVM, told LaJarvis, in sum and substance, that he could not pursue any legal action against West because too much time had passed and he was now an old man suffering from a fatal disease.

138.    Joshua only considered coming forward once he learned through the St. Francis school/church bulletin that someone else had reported to St. Francis being abused by West and had not been killed for speaking out.

139.    Thereafter, Joshua learned that LaJarvis was the individual who had reported the

sexual abuse to St. Francis and, for the first time, he was able to acknowledge the abuse he endured and reported the abuse to St. Francis.

140.   LaJarvis informed Joshua that West was now ill and could not hurt him anymore.

141.   St. Francis, the Diocese of Jackson and Gannon then used their control and influence over La Jarvis and Joshua to coerce them into not taking legal action in 2018.

142.   Joshua and LaJarvis did not escape the power and control of the Defendants' coercion until 2019 and could not have brought a claim prior to 2019.

143.   On February 14, 2019, New York State enacted a statute providing for a one-year retrospective window to commence civil actions, from August 14, 2019 until August 14, 2020, for all previously time barred claims alleging a sexual offense as defined in Section 130 of the New York State Penal Law against a person within the State of New York who are less than 18 years of age, or any action commenced against any party whose intentional or negligent acts or omissions are alleged to have resulted in the commission of said conduct.

144.   The conduct of West, and indirectly by the other Defendants, through negligent acts or omissions in New York, are sexual offenses as defined in Section 130 of the New York State Penal Law.

145.   At the time of the conduct at issue, Plaintiffs were both under age of 18.

## VII.   CAUSES OF ACTION

### COUNT I
### 18 U.S.C. § 2255 as to Violations of 18 U.S.C. § 2241(c)
### As Against Defendant Brother Paul West

146.    Plaintiffs repeat and re-allege each and every allegation set forth in the preceding paragraphs, as if fully set forth herein.

147.    Plaintiffs are victims of Aggravated Sexual Assault within the meaning of 18 U.S.C. § 2241(c) and are, therefore, entitled to bring a civil action under 18 U.S.C. § 2255.

148.    In or about 1995, West drove Plaintiffs across states lines from Mississippi to New York wherein he forced Plaintiffs to engage in numerous and repeated sex acts in violation of 18 U.S.C. § 2241(c).

149.    West drove Plaintiffs across state lines with the intent of compelling Plaintiffs to engage in numerous and repeated sex acts for West's sexual gratification.

150.    In or about 1995, Plaintiffs were minors and of the ages covered under 18 U.S.C. § 2241(c).

151.    Plaintiffs have suffered substantial physical and psychological injuries as the result of being sexually assaulted by West in violation of 18 U.S.C. § 2241(c).

152.    West's acts were the direct and proximate cause of Plaintiffs' injuries.

153.    By reason of the foregoing, Plaintiffs demand judgment against West for compensatory damages and punitive damages, together with interest, costs of suit, attorneys' fees and all such other and further relief as this Court deems proper.

## COUNT II
### 18 U.S.C. § 2255 as to Violations of 18 U.S.C. § 2421
### As Against Defendant Brother Paul West

154.   Plaintiffs repeat and re-allege each and every allegation set forth in the preceding paragraphs, as if fully set forth herein.

155.    Plaintiffs are victims of violations of the Mann Act within the meaning of 18 U.S.C. § 2421 and are, therefore, entitled to bring a civil action under 18 U.S.C. § 2255.

156.   In or about 1995, West drove Plaintiffs across states lines from Mississippi to New York wherein he forced Plaintiffs to engage in numerous and repeated sex acts in violation of 18 U.S.C. § 2421.

157.   West drove Plaintiffs across state lines with the intent of compelling Plaintiffs to engage in numerous and repeated sex acts for West's sexual gratification.

158.   Plaintiffs have suffered substantial physical and psychological injuries as the result of being sexually assaulted by West in violation of 18 U.S.C. § 2241(c).

159.   West's acts were the direct and proximate cause of Plaintiffs' injuries.

160.   By reason of the foregoing, Plaintiffs demand judgment against West for compensatory damages and punitive damages, together with interest, costs of suit, attorneys' fees and all such other and further relief as this Court deems proper.

## COUNT III
### Negligence/Gross Negligence
### As Against All Defendants

161.   Plaintiffs repeat and re-allege each and every allegation set forth in the preceding paragraphs, as if fully set forth herein.

162.   At all relevant times, with regard to the allegations contained herein, West was under the supervision, employ, direction and/or control of Defendants, either directly or indirectly.

163.    At all relevant times, Defendants, either directly or indirectly, owed Plaintiffs, as minors, a duty to protect them from West's sexual deviancy and the consequential damages, both prior to and/or subsequent to West's misconduct.

164.    Defendants knew, should have known, or were negligent in not knowing, that West posed a threat of sexual abuse to minor children.

165.    The acts of West described hereinabove were undertaken, and/or enabled by, and/or during the course, and/or within the scope of his respective employment, appointment, assignment, and/or agency with the Defendants.

166.    Defendants unreasonably failed to adequately supervise the activities of West, unreasonably failed to enact proper procedures and regulations to prevent harm to minor children through sexual abuse, unreasonably employed improper persons or instrumentalities in work involving risk of harm to others, unreasonably permitted and/or intentionally failed and/or neglected to prevent, negligent and/or grossly negligent conduct and/or allowed other tortious conduct by persons, whether or not their servants and/or agents and/or employees, with instrumentalities under their control, unreasonably gave improper or ambiguous orders, and allowed the acts of omission and/or commission and/or any or all of the allegations set forth in this Complaint, to occur.

167.    Defendants willful, wanton, grossly negligent and/or negligent act(s) of commission and/or omission, resulted directly and/or proximately in the damage set forth herein.

168.    At all times material hereto, Defendants were willful, wanton, malicious, reckless, and outrageous in their disregard for the rights and safety of Plaintiffs, which amounted to conduct equivalent to criminality.

169.    Defendants willful, wanton, grossly negligent and/or negligent act(s) of

commission and/or omission, resulted directly and/or proximately in the damage set forth herein.

170.    As a direct and proximate result of said conduct, Plaintiffs have suffered the injuries and damages described herein.

171.    By reason of the foregoing, Plaintiffs demand judgment against each Defendant, individually, jointly and severally for compensatory damages and punitive damages, together with interest, costs of suit, attorneys' fees and all such other and further relief as this Court deems proper.

**COUNT IV**
**Negligent Infliction of Emotional Distress**
**As Against All Defendants**

172.    Plaintiffs repeat and re-allege each and every allegation set forth in the preceding paragraphs, as if fully set forth herein.

173.    As described above, the actions of Defendants, their predecessors and/or successors, agents, servants and/or employees were conducted in a negligent and/or grossly negligent manner.

174.    Defendants' actions and/or inactions endangered Plaintiffs' safety and caused them to fear for their own safety and suffer harm.

175.    As a direct and proximate result of Defendants' actions and/or inactions which included, but were not limited to, negligent and/or grossly negligent conduct, Plaintiffs suffered the severe injuries and damages described herein, including but not limited to mental and emotional distress.

176.    By reason of the foregoing, Plaintiffs demand judgment against each Defendant, individually, jointly and severally for compensatory damages and punitive damages, together with interest, costs of suit, attorneys' fees and all such other and further relief as this Court deems

proper.

## COUNT V
### Intentional Infliction of Emotional Distress
### As Against Defendant Brother Paul West

177.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs above, as if fully set forth herein.

178.    West committed acts of sexual abuse against LaJarvis and Joshua in New York when they were minor children, as alleged herein.  West's conduct was extreme and outrageous, and intentionally caused them to suffer extreme emotional distress and mental anguish that is ongoing.

179.    As a direction and proximate result of the abuse at the hands of West, Plaintiffs have suffered injuries and damages described herein.

180.    By reason of the foregoing, Plaintiffs demand judgment against West for compensatory damages and punitive damages, together with interest, costs of suit, attorneys' fees and all such other and further relief as this Court deems proper.

## COUNT VI
### Sexual Abuse in Violation of New York Penal Law Section 130
### As Against Defendant Brother Paul West

181.    Plaintiffs repeat and re-allege each and every allegation set forth in the preceding paragraphs, as if fully set forth herein.

182.    West sexually assaulted, sexually abused, and/or had sexual contact with Plaintiffs in violation of the laws of the State of New York. *See* N.Y. Penal Law Section 130.

183.    By repeatedly sexually assaulting, sexually abusing, and/or having sexual contact with Plaintiffs, West placed Plaintiffs in imminent and reasonable apprehension of harmful and offensive contact.

184.    By repeatedly sexually assaulting, sexually abusing, and/or having sexual contact with Plaintiffs, West acted so as to cause repeated unjustified, harmful and offensive physical contact with Plaintiff.

185.    As a direct and proximate result of West's conduct, Plaintiffs have suffered the injuries and damages described herein.

186.    By reason of the foregoing, Plaintiffs demand judgment against West for compensatory damages and punitive damages, together with interest, costs of suit, attorneys' fees and all such other and further relief as this Court deems proper.

## COUNT VII
### Rescission of Contract
### As Against All Defendants

187.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs above, as if fully set forth herein.

188.    Plaintiffs dispute the formation and enforcement of any purported settlement agreements and maintain that the settlement agreements were entered into through undue influence, mistake and were unconscionable.

189.    Gannon and McClellan used their dominant positions of authority over Plaintiffs to unfairly persuade and coerce Plaintiffs to enter into the settlement agreements.

190.    Gannon and McClellan persuasion coupled with Plaintiffs lacked understanding of the terms of the agreement at the time the agreement was signed due to their limited ability to read prevented Plaintiffs from exercising free and competent judgment as to whether to enter into such contracts.

191.    Plaintiffs were mistaken as to what covered conduct was included in the settlement agreements.

192.     The settlement agreements covered conduct section describe "trips" on which Joshua and LaJarvis were abused by West, but the agreements were ambiguous without specifically naming the dates and locations of the trips and did not specify whether the "trips" to New York were contemplated in the settlement agreement term.

193.     Neither Joshua nor LaJarvis understood what the covered conduct in their settlement agreements included.

194.     Given the extensive and systematic control and coercion over Plaintiffs by Gannon and McClellan, the settlement agreements were so unfair, entered into through grossly unequal bargaining power, and shock the conscience of any reasonable person.

195.     The settlement agreements should be invalidated as a result of the affirmative defenses to contract of undue influence and mistake.

196.     The settlement agreements should not be enforced as a result of the affirmative defense of unconscionability.

197.     Neither Joshua nor LaJarvis would have signed the agreement if they had been able to exercise free and competent judgment as to what they were agreeing to.

198.     The grossly unequal bargaining power by and among Plaintiffs, Gannon and McClellan prevents enforcement of the settlement agreements.

199.     The settlement agreements should be invalidated as a result of the affirmative defenses to the formation of the contract of undue influence and mistake, and the affirmative defenses to enforcement of the contract of unconscionability.

200.     As a result such affirmative defenses, the settlement agreements, and the terms contained within it, are legally invalid and void.

201.    By reason of the foregoing, Plaintiffs demand rescission of the settlement agreements and all such other and further relief as this Court deems proper.

## COUNT VIII
### Declaratory Judgment that Plaintiffs Never Formed the Subject Settlement Agreements As Against All Defendants

202.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

203.    Plaintiffs never formed agreements to settle claims with Defendants as the settlement agreements were obtained through unfair persuasion by Gannon and McClellan over the Plaintiffs.

204.    McClellan, as Plaintiffs counselor and therapist, knew the full extent of Plaintiffs mental susceptibility as a result of the abuse they suffered as children and used her position of authority to assert her dominant position during the course of the negotiations that led to the settlement agreements.

205.    McClellan also provided direct counseling to Plaintiffs as a licensed therapist, including during the time period the subject agreements were brokered.

206.    Gannon, as a representative of Defendants and knowing Plaintiffs were in a dire financial condition and lacked a understanding of the agreement terms, used his position of authority to assert his dominant position during the course of the negotiations that led to the settlement agreements.

207.    Gannon and McClellan improperly provided legal advice to Joshua and LaJarvis concerning their ability (or lack thereof) to bring legal action against West in order to influence them to sign the subject settlement agreements.

208.    Plaintiffs never formed agreements to settle claims with Defendants as Plaintiffs

were mistaken as to essential elements of the settlements and did not bear the risk such mistakes in the settlement agreements.

209.    Plaintiffs were mistaken as to what covered conduct was included in the settlement agreements and did not understand the covered conduct terms of the settlement agreements.

210.    The settlement agreements describe "trips" on which Joshua and LaJarvis were abused by West, but the agreements were ambiguous without specifically naming the dates and locations of the trips and did not specify whether the "trips" to New York were contemplated in the settlement agreement term.

211.    Pursuant to 28 USC §2201(a), Plaintiffs seek a declaratory judgment that Plaintiffs never formed the subject settlement agreements and said settlement agreements are legally invalid, void, and of no force.

**COUNT IX**
**Declaratory Judgment that the Subject Settlement Agreements Are Unenforceable**
**As Against All Defendants**

212.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

213.    The settlement agreements are unenforceable as the settlement agreements were so unfair that no reasonable person would have agreed to it.

214.    Plaintiffs could not comprehend the terms of the settlement and were not provided an opportunity to seek independent counsel.

215.    The dominant authority of Gannon and McClellan over Plaintiffs in negotiating the settlement agreements were offensive and shocks the conscience of any reasonable party to a contract.

216.    The dominant authority of Gannon and McClellan over Plaintiffs placed Plaintiffs

in a position of grossly uneven bargaining power in negotiating the settlement agreements with Gannon and McClellan.

217.    Such grossly uneven bargaining power were so unfair as to prevent enforcement of the settlement agreements.

218.    Pursuant to 28 USC §2201(a), Plaintiffs seek a declaratory judgment that the settlement agreements are unenforceable as unconscionable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, demand judgment against the Defendants on each cause of action and pray that this Court grant the following relief:

A.    Awarding compensatory damages in an amount to be proved at trial, but in any event in an amount that exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction; extent permitted by law;

B.    Awarding punitive damages to the extent permitted by law;

C.    Awarding costs and fees of this action, including attorneys' fees to the extent permitted by law;

D.    Awarding pre-judgment and post-judgment interest to the extent permitted by law;

E.    Entering a declaratory judgment that the purported settlement agreements are legally invalid, void, and of no force;

F.    Entering a declaratory judgment that the purported settlement agreements are unenforceable; and

G.    Awarding any such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated:          November 21, 2019
                New York, New York

                                        Respectfully Submitted,


                                        */s/ Paul J. Pennock*
                                        Paul J. Pennock (PP-3315)
                                        **WEITZ & LUXENBERG, P.C.**
                                        700 Broadway
                                        New York, NY 10003
                                        Tel: (212) 558-5549
                                        Email: ppennock@weitzlux.com

                                        John Hawkins
                                        *Anticipating Pro Hac Vice Admission*
                                        **HAWKINS LAW, P.C.**
                                        308 East Pearl Street
                                        Post Office Box No. 24627
                                        Jackson, MS 39225
                                        Tel: (601) 969-9692
                                        Email: john@hgattorneys.com

                                        *Attorneys for Plaintiffs*