UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LAJARVIS LOVE and JOSHUA LOVE,

                 Plaintiffs,

– against –

PAUL WEST, SAINT FRANCIS OF ASSISI SCHOOL, CATHOLIC DIOCESE OF JACKSON, FRANCISCAN BROTHERS OF BROOKLYN, and FRIARS OF ASSUMPTION BVM PROVINCE, INC.,

                 Defendants.

**OPINION & ORDER**

19 Civ. 10799 (ER)

Ramos, D.J.:

    LaJarvis Love and Joshua Love brought this suit arising out of alleged sexual assaults by Paul West and non-party Donald Lucas.[1]  Doc. 1.  Pending before the Court is the Catholic Diocese of Jackson's (the "Diocese") motion to dismiss for lack of personal jurisdiction and the Loves' motion for leave to conduct jurisdictional discovery.  *See* Docs. 52 and 58.

    For the following reasons, the Diocese's motion is DENIED, and the Loves' motion is DENIED as moot.

**I.    BACKGROUND**

    **A. Factual Background**

    The following are the only facts alleged in the Loves' Amended Complaint that are relevant to the instant motions.  The Loves are cousins who grew up in Greenwood, Mississippi.  Doc. 43 ¶ 59.  They were raised by their grandmother, and together they attended services and went to school at St. Francis, a Catholic church in Greenwood.  *Id.* ¶¶ 61–62, 72.  West served as a brother at St. Francis between June 1993 and November

---

[1] Lucas passed away in 1999.  Doc. 43 ¶ 152.

1998, *id.* ¶ 10, and Lucas began his service as a brother there in 1995, *id.* ¶ 83. At all times relevant to the instant suit, the Diocese operated St. Francis, along with several other parishes and missions in the Mississippi area. *Id.* ¶¶ 64–65. Additionally, the Loves allege that the Diocese employed, managed, and supervised each and every brother assigned to work in its parishes, churches, and schools—including West and Lucas. *Id.* ¶¶ 10, 13; *see also id.* ¶ 67. When they were in elementary school, the Loves would clean up or do yard work at St. Francis under the supervision of West and Lucas. *Id.* ¶¶ 73–74.

While the Loves allege a number of instances of abuse by West and Lucas when the Loves attended St. Francis, *see id.* ¶¶ 73–85, 91, the allegations relevant to the instant motion pertain to West's time with the Loves in New York in the summer of 1995, when Joshua was in fifth grade and LaJarvis was in sixth grade, *id.* ¶¶ 38, 83. That summer, West drove LaJarvis from Mississippi to New York to take him to a camp operated by the Franciscan Brothers of Brooklyn. *Id.* ¶¶ 24, 88. West allegedly drugged LaJarvis and sexually molested him in his car during the trip—including while in New York. *Id.* ¶ 88. After leaving LaJarvis at the camp, West drove back to Mississippi, picked up Joshua, and drove him to the camp in New York. *Id.* ¶ 89. When West arrived at the camp, he picked up LaJarvis and took the Loves to a hotel in Manhattan for an overnight stay. *Id.* ¶¶ 40, 89–90. While in the hotel, West allegedly raped both LaJarvis and Joshua, and encouraged them to perform sex acts with each other. *Id.* ¶ 90.

According to the Loves, the Diocese authorized and consented to West's travel to New York, *id.* ¶ 96; *see also id.* ¶¶ 40–41, and also compensated and funded the trip, *see id.* ¶ 97. Despite being responsible for managing and directing West's actions during the trip, *id.* ¶¶ 40–41, 98, the Diocese failed to prevent him from sexually assaulting the Loves, *see id.* ¶ 101.

In 2018, LaJarvis reported the abuse he had suffered to the Diocese, and he was then put in contact with Valerie McClellan, a victim assistance coordinator with the Diocese. *Id.* ¶¶ 103–04. Around that time, Joshua reported the abuse he suffered to

2

McClellan. *Id.* ¶¶ 108–09.  Soon after, the Loves both entered into settlement agreements in exchange for the release of their claims against West, Lucas, and the Friars of Assumption BVM Province, Inc.  *Id.* ¶¶ 121, 125, 135–36.  According to the Loves, however, they did not fully understand the scope and terms of the agreement, and they claim that they were manipulated into entering into the agreements by representatives of the Diocese, St. Francis, and the Friars of Assumption BVM.  *Id.* ¶¶ 127, 156–57, 161.

### B. Procedural History

The Loves filed the instant suit on November 21, 2019, asserting claims under 18 U.S.C. § 2255 (for violations of 18 U.S.C. § 2241(c) and 18 U.S.C. § 2421) and New York Penal Law § 130, along with a claim for intentional infliction of emotional distress, against West.  Doc. 1.  Additionally, the Loves asserted claims for negligence/gross negligence, negligent infliction of emotional distress, rescission of contract, and declaratory judgment against all Defendants.  *Id.*  Following a pre-motion conference, the Loves filed their Amended Complaint on March 12, 2020.  Doc. 43.

On May 13, 2020, the Diocese filed the instant motion to dismiss for lack of personal jurisdiction.  Doc. 52.  On July 10, 2020, the Loves filed the instant motion for leave to permit limited discovery regarding personal jurisdiction over the Diocese in the event that the Court granted the Diocese's motion.  Doc. 58.

## II.    MOTION TO DISMISS

### A. Legal Standard

"A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom [he] seeks to bring suit."  *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010).  When ruling on a 12(b)(2) motion, a court may rely on materials outside the pleadings.  *Casville Invs., Ltd. v. Kates*, No. 12 Civ. 6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013).  Further, this Circuit has long held that "[i]n deciding a pretrial motion to dismiss for lack of personal jurisdiction[,] a district court has considerable procedural leeway.  It may determine the motion on the

3

basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quotation omitted). Relatedly, the showing a plaintiff must make to defeat a Rule 12(b)(2) motion "varies depending on the procedural posture of the litigation." *Id.* (quotation omitted). If a court relies on pleadings and affidavits without conducting an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdiction. *See Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005); *see also In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 630 (S.D.N.Y. 2017). At the pleading stage—and prior to discovery—that "showing may be established solely by allegations." *City of New York v. Hatu*, No. 18 Civ. 848 (PAE), 2019 WL 2325902, at *4 (S.D.N.Y. May 31, 2019) (internal quotation mark omitted) (quoting *Dorchester*, 722 F.3d at 85). Further, "[a] plaintiff may make this showing through [his] 'own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant.'" *Id.* at *5 (quoting *S. New Eng. Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010)). As the Court evaluates a Rule 12(b)(2) motion, it must construe all of the plaintiff's pleadings, allegations, and affidavits in the light most favorable to the plaintiff, resolving all doubts in his favor. *See id.*; *see also Casville*, 2013 WL 3465816, at *3 (citing *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)). "However, a plaintiff may not rely on conclusory statements without any supporting facts, as such allegations would 'lack the factual specificity necessary to confer jurisdiction.'" *Art Assure Ltd., LLC v. Artmentum GmbH*, No. 14 Civ. 3756 (LGS), 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014) (quoting *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998)).

In litigation arising under a federal statute that does not contain its own jurisdictional provision, a court engages in a two-step inquiry to determine whether it has personal jurisdiction over a foreign defendant. *See Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 224 (2d Cir. 2014); *Penguin Grp.*, 609 F.3d at 35. First, a

court must "determine whether the defendant is subject to jurisdiction under the law of the forum state—here, New York." *Sonera Holding*, 750 F.3d at 224. Second, if the law of the forum state permits personal jurisdiction, a court must "analyze whether personal jurisdiction comports with due process protections established under the Constitution." *Eades v. Kennedy, PC Law Offs.*, 799 F.3d 161, 168 (2d Cir. 2015).

### B. Analysis

#### 1. Jurisdiction Under New York Law

"There are 'two categories of personal jurisdiction: general and specific personal jurisdiction. General, all-purpose jurisdiction permits a court to hear 'any and all claims' against an entity. Specific jurisdiction, on the other hand, permits adjudicatory authority only over issues that aris[e] out of or relat[e] to the [entity's] contacts with the forum.'" *Thackurdeen v. Duke Univ.*, 130 F. Supp. 3d 792, 798 (S.D.N.Y. 2015) (quoting *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 134 (2d Cir. 2014)). The Loves do not contest that the Court lacks general personal jurisdiction over the Diocese. *See* Doc. 55 at 4. Instead, the Loves assert that the Court has specific personal jurisdiction over the Diocese.

Under New York law, "[s]pecific jurisdiction is governed by CPLR § 302(a), which empowers courts to exercise jurisdiction over non-domiciliaries when the causes of action in the case 'aris[e] from' one of four specific kinds of contact within New York." *Thackurdeen*, 130 F. Supp. 3d at 801. Under § 302(a)(2), a court may exercise personal jurisdiction over a non-domiciliary who through an agent "commits a tortious act within the state." C.P.L.R. § 302(a)(2). "[T]here is no minimum threshold of activity required so long as the cause of action arises out of the allegedly infringing activity in New York." *Hatu*, 2019 WL 2325902, at *5 (quoting *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 567 (S.D.N.Y. 2000)). Additionally, "New York courts have recognized that jurisdiction under § 302(a)(2) may extend to out-of-state individuals who did not themselves commit a tort while physically present in New York but who can be deemed responsible for such a tort based upon theories of agency or conspiracy."

5

*LaChapelle v. Torres*, 1 F. Supp. 3d 163, 169 (S.D.N.Y. 2014). Put another way, "if a tort is committed by a person who is physically present in New York but who is acting as an agent of . . . an out-of-state individual, courts may attribute the in-state acts to an out-of-state defendant for the purposes of obtaining personal jurisdiction." *Id.* "In determining whether an agency relationship exists for the purposes of Section 302, courts 'have focused on the realities of the relationship in question rather than the formalities of agency law.'" *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 442 (S.D.N.Y. 2008) (quoting *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986)); *see also Biz2Credit, Inc. v. Kular*, No. 14 Civ. 8223 (ER), 2015 WL 2445076, at *7 n.14 ("As used in Section 302(a)(2), 'agent' is defined broadly to include a defendant's formal agents and, under certain circumstances, a defendant's co-conspirators."). Accordingly, "[w]hether a defendant's representative is an 'agent' for purposes of § 302(a) hinges on whether the representative acted 'for the benefit of and with the knowledge and consent of [the] defendant and [the defendant] exercised some control over [the agent] in the matter.'" *Emerald Asset Advisors, LLC v. Schaffer*, 895 F. Supp. 2d 418, 430 (E.D.N.Y. 2012) (quoting *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988)). "While the principal need not exercise absolute control over the decisions or acts of the putative agent," "a sufficient amount of control may involve the ability of the principal to influence such acts or decisions by virtue of the parties' respective roles." *Maersk, Inc.*, 554 F. Supp. 2d at 442 (quotation omitted). Further, "[a] plaintiff need not demonstrate . . . that the defendant exercised direct control over its putative agent." *In re Welspun Litig.*, No. 16 Civ. 6792 (VB), 2019 WL 2174089, at *7 (S.D.N.Y. May 20, 2019).

As an initial matter, it is undisputed that the Loves have sufficiently alleged that West conducted tortious activity within New York, and it is undisputed that the Diocese has taken no direct action in New York in relation to the instant suit. Instead, the Loves assert that, because West acted as the Diocese's agent in New York when he committed

the tortious activity, the Court has personal jurisdiction over the Diocese pursuant to C.P.L.R. § 302(a)(2).

The Diocese challenges the Loves' reliance on C.P.L.R. § 302(a)(2) in two ways. First, the Diocese proffers the affidavit of Mary Woodward (the "Woodward Affidavit"), the chancellor of the Diocese, countering the allegations in the Amended Complaint. Doc. 54. Contrary to those allegations, the Diocese avers that it did not manage or control St. Francis or its employees, nor did it make decisions relating to the school's employment, education, or trip itineraries. *Id.* ¶¶ 3–7. Further, according to the Diocese, it did not assign or supervise West, Lucas, or any of the other brothers at St. Francis. *Id.* ¶¶ 7–9. However, at this procedural juncture, the Court must construe the Loves' allegations such that any conflicts are resolved in their favor. *Hatu*, 2019 WL 2325902, at *5. Accordingly, for the purposes of the instant motion, the Court must accept the Loves' allegations as true despite the statements in the Woodward Affidavit to the contrary.

Second, the Diocese argues that, regardless of the Woodward Affidavit, the Amended Complaint fails to allege facts sufficient to meet the jurisdictional agency standard. Specifically, the Diocese contends that the Loves have offered non-specific and conclusory allegations regarding the Diocese's control over West while he was in New York, and that the Loves' allegations fail to show that the Diocese knew or consented to West's actions in New York. Thus, the Diocese argues, West's actions in New York—and the injuries arising from his actions there—cannot be imputed to the Diocese.

The Court disagrees. Again, the Loves allege that the Diocese employed, managed, and supervised West, and that it authorized and funded West's travel to New York as part of his work. As such, West's alleged tortious activity arose from activity that was for the benefit of and with the knowledge and consent of the Diocese, and the Diocese exercised some control over West in relation to the New York trip, thereby

rendering West an agent of the Diocese for the purposes of C.P.L.R. § 302(a)(2). *See Emerald Asset Advisors, LLC*, 895 F. Supp. 2d at 430.

The Diocese's reliance on *Karabu Corporation v. Gitner*, 16 F. Supp. 2d 319 (S.D.N.Y. 1998) does not counsel otherwise. In that case, the court evaluated whether out-of-state corporate officers used a corporation to commit tortious activity in New York, thereby rendering the *corporation* an agent of the officers.[2] *Id.* at 323. As the court noted, "[a]t the heart of [its] inquiry is whether the out-of-state corporate officers were 'primary actor[s] in the transaction in New York' that gave rise to the litigation, and not merely 'some corporate employee[s] . . . who played no part in' it." *See id.* (quoting *Retail Software Servs., Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir. 1988)). The court ultimately concluded that it lacked personal jurisdiction because the plaintiff failed to show that the corporate-officer defendants were primary actors in the specific matter at issue, noting that "control cannot be shown based merely upon a defendant's title or position within the corporation, or upon conclusory allegations that the defendant controls the corporation." *Id.* at 324.

Relying on *Karabu*, the Diocese argues that the Loves have failed to establish a prima facie showing that West was the Diocese's agent, asserting that they do not sufficiently allege that the Diocese was a "primary actor" in relation to the tortious activity. But the analysis in *Karabu* is inapposite, as the "primary actor" inquiry in *Karabu* is limited to the context where corporate personnel are alleged to have used a corporation (or another employee of the corporation) as an agent, and those circumstances are not present here. *See id.* at 324–26; *see also Sea Tow Servs. Int'l, Inc. v. Pontin*, 472 F. Supp. 2d 349, 361 (E.D.N.Y. 2007). Again, under C.P.L.R. § 302(a), a plaintiff need only show that a non-domiciliary defendant has "some control" over the

---

[2] Specifically, the court examined personal jurisdiction under C.P.L.R. § 302(a)(1), *Karabu*, 16 F. Supp. 2d at 323, which relies upon the same agency framework as C.P.L.R. § 302(a)(2), *see Kreutter*, 71 N.Y.2d at 467; *see also GEM Advisors, Inc. v. Corporación Sidenor, S.A.*, 667 F. Supp. 2d 308, 318–19 (S.D.N.Y. 2009).

8

putative agent in the matter, *Emerald Asset Advisors, LLC*, 895 F. Supp. 2d at 430, including by showing that the defendant has "the ability . . . to influence such acts or decisions by virtue of the parties' respective roles," *Maersk*, 554 F. Supp. 2d at 442. As noted, the Loves have met that burden.

The Court is also not convinced by the Diocese's reliance on cases by Delaware federal and state courts. The Diocese points to those cases to argue that the Loves have failed to allege sufficient facts to show that West was the Diocese's agent for the purposes of personal jurisdiction. *See, e.g.*, *Elliott v. The Marist Brothers of the Schs., Inc.*, 675 F. Supp. 2d 454, 458–59 (D. Del. 2009). However, even if Delaware's long-arm statute were similar to the New York long-arm statute, here, unlike in those cases, the Loves have not only alleged that the Diocese employed and managed West when the tortious activity occurred in New York, but they also allege that it authorized and funded West's travel, and that the travel occurred as part of his work. Doc. 43 ¶¶ 40–41, 96–98, 101. Because the Loves have sufficiently alleged that West was its agent when the tortious activity occurred in New York, the Court concludes that it has specific jurisdiction under C.P.L.R. § 302(a)(2).

*2. Due Process Protections Established Under the Constitution*

Having established that New York's long-arm statute authorizes the exercise of personal jurisdiction over the Diocese, the Court must next determine whether that exercise is consistent with due process. *Hatu*, 2019 WL 2325902, at *9. "To establish personal jurisdiction over a defendant, due process requires a plaintiff to allege (1) that a defendant has certain minimum contacts with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances." *Eades*, 799 F.3d at 168–69 (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013)).

Regarding minimum contacts, the Court must "evaluate the quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test." *Id.* at 169 (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170

9

(2d Cir. 2013)). Where specific jurisdiction is asserted, "minimum contacts necessary to support such jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Id.* (quoting *Licci*, 732 F.3d at 170)). As the Supreme Court has long recognized, "'the commission of some single or occasional acts of the corporate agent in a state' may sometimes be enough to subject the corporation to jurisdiction in that state's tribunals with respect to suits relating to that in-state activity." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945)); *see also Eades*, 799 F.3d at 169. Here, the Diocese's contacts with New York—knowingly authorizing and consenting to West traveling with students to a camp in the state in connection with his duties at St. Francis—readily qualifies as purposeful availment, thereby satisfying the minimum contacts test. *See Hatu*, 2019 WL 2325902, at *9.

"If minimum contacts exist, the defendant has to 'present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Eades*, 799 F.3d at 169 (quoting *Licci*, 732 F.3d at 173). Ultimately, "[r]easonableness hinges on whether the assertion of jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Chatwal Hotels & Resorts LLC v. Dollywood Co.*, 90 F. Supp. 3d 97, 107 (S.D.N.Y. 2015) (quoting *Int'l Shoe*, 326 U.S. at 316). The Court considers five factors when determining reasonableness:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Eades*, 799 F.3d at 169 (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010)).

As an initial matter, "[b]ecause the New York long-arm statute is more restrictive than the federal due process requirements, by virtue of satisfying the long-arm statute[,] the minimum contacts and reasonableness requirements of due process have similarly been met." *Chatwal*, 90 F. Supp. 3d at 108; *see also Licci*, 673 F.3d at 60–61 (noting that "[t]he New York long-arm statute does not extend in all respects to the constitutional limits"). Regardless, the five factors indicate that the exercise of jurisdiction is reasonable. As to those factors, the Diocese argues only that it will suffer a significant burden litigating in New York rather than in its home state of Mississippi. While litigating in New York may be more burdensome for the Diocese, that factor alone does not outweigh New York's interests in adjudicating a case where tortious activity occurred in the state and in protecting the safety of individuals in the state, along with the Loves' interest in pursuing a single lawsuit including the Diocese in the forum they chose rather than commencing a second suit in Mississippi. Accordingly, the Court concludes that both the minimum contacts and reasonableness requirements of due process have been met, and the exercise of personal jurisdiction over the Diocese is proper.

### III.   CONCLUSION

For the foregoing reasons, the Diocese's motion is DENIED. The Diocese's request for oral argument regarding its motion and the Loves' motion for jurisdictional discovery are DENIED as moot. Docs. 57 and 58. The parties are directed to appear for a status conference on March 2, 2021 at 11:00 a.m. The parties are directed to dial (877) 411-9748 and enter access code 3029857, followed by the pound (#) sign. The Clerk of Court is respectfully directed to terminate the motions. Docs. 52 and 58.

It is SO ORDERED.

Dated:   February 8, 2021
         New York, New York

EDGARDO RAMOS, U.S.D.J.